POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY SANCHEZ and THOMAS TOSSAVAINEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DECISION DIAGNOSTICS CORP. and KEITH M. BERMAN,<br><br>Defendants. | Case No. 21-cv-00418-JAK-JPR<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Hon. John A. Kronstadt<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Anthony Sanchez and Thomas Tossavainen ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, United States ("U.S.") Department of Justice ("DOJ") filings and press releases, the U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Decision Diagnostics Corp. ("Decision Diagnostics" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **<u>NATURE OF THE ACTION</u>**

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Decision Diagnostics stock between March 3, 2020 and December 17, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

1

"Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its top official.

2.      Decision Diagnostics purportedly offers, among other products and services, prescription and non-prescription diagnostics and home testing products.

3.      From March 2020 to at least December 2020, Defendants Berman and Decision Diagnostics artificially increased and/or maintained an artificial price of Decision Diagnostics' stock (ticker symbol: DECN) by: (1) making false, fraudulent, and/or misleading public statements related to the Company's purported COVID-19 test; (2) concealing the truth about the Company's purported COVID-19 test; and (3) concealing from regulators, law enforcement, and thus, the investing public and shareholders. Defendant Berman also took for himself an illicit personal benefit from the scheme, by converting hundreds of thousands of dollars of Company funds for his personal use.

4.      Defendants Berman and Decision Diagnostics falsely claimed that the Company had developed a finger-prick blood test that could detect COVID-19 in less than one minute. They also made additional false representations regarding the Company's progress towards achieving Food and Drug Administration ("FDA") Emergency Use Authorization ("EUA") for this purported COVID-19 finger-prick blood test.

2

5.      Specifically, in their public communications during the Class Period regarding the Company's business, operations, and the existence and effectiveness of its purported COVID-19 test, Berman and Decision Diagnostics: (i) omitted that Decision Diagnostics had failed to develop any viable COVID-19 test, much less a test that could detect COVID-19 in less than one minute; (ii) omitted that the Company had not met and could not meet the EUA testing requirements for its purported COVID-19 test; (iii) misrepresented the timeline within which Decision Diagnostics could bring a COVID-19 test to market, if it could at all; and (iv) all the foregoing misrepresentations subjected Decision Diagnostics to an increased risk of regulatory oversight and enforcement. As a result, Berman's and Decision Diagnostics' public statements about the Company's most important product candidate were materially false and/or misleading at all times.

6.      Defendant Berman, operating as an executive of Decision Diagnostics, also used aliases to post false and/or misleading statements about the Company on investor message boards, which had the natural effect of artificially increasing (and/or maintaining artificial pricing) the price of DECN stock. As charged by the Department of Justice, Berman used the aliases "Plutonium," "Plutoniumimplosion," and "Matthew Steinmann" to falsely push back in stock message boards against criticism about the Company's COVID-19 test product candidate and concerns about whether Berman misappropriated corporate funds.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

7.    In an effort to cover his tracks, Berman also made false statements to the SEC and federal law enforcement regarding his use of aliases.

8.    On December 17, 2020, the SEC filed a complaint[1] in federal court against Defendants Berman and Decision Diagnostics ("SEC Complaint"). The SEC Complaint alleged that Defendants had issued a series of press releases that falsely claimed that Decision Diagnostics had developed a finger-prick blood test that could detect COVID-19 in less than one minute. According to the SEC Complaint, Defendants made false and/or misleading statements claiming that Decision Diagnostics had a viable COVID-19 testing device and was making progress towards achieving FDA EUA for that device, when in fact Decision Diagnostics lacked a proven method for detecting the virus and had no physical testing device. The SEC Complaint further alleged that the statements created the misleading impression that Decision Diagnostics would soon introduce the COVID-19 test to the market, which led to surges in the price and trading volume of the Company's stock.

9.    On December 15, 2020, the DOJ issued an indictment ("Indictment")[2] in federal court against Defendant Berman, which was unsealed on December 18,

---

[1] Complaint and Demand for Jury Trial, *SEC v. Keith Berman and Decision Diagnostics Corp.*, 20-CV-10658 (S.D.N.Y Dec. 18, 2020), ECF No. 1, https://www.sec.gov/litigation/complaints/2020/comp-pr2020-327.pdf
[2] Indictment, *USA v. Keith Berman*, 20-cr-278 (D.D.C. Dec. 15, 2020), ECF No. 1, https://www.justice.gov/opa/press-release/file/1347111/download

4

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2020. The Indictment charged Berman with making false statements to the Department of Justice and alleged that Berman compromised the Company's financial standing through his misuse of company funds. The Indictment alleged that Berman criminally misrepresented the viability of the aforementioned test strip technology in detecting COVID-19 through a series of false and/or misleading press releases aimed at DECN shareholders throughout 2020. The DOJ later filed a superseding indictment ("Superseding Indictment")[3] on May 11, 2021 against Keith Berman "a/k/a 'Matthew Steinmann.'" Berman allegedly used the name "Matthew Steinmann" on Internet message boards to tout Decisions Diagnostics stock.

10.     As a result of the misconduct disclosed in the SEC Complaint and unsealed DOJ Indictment, Decision Diagnostics' common share price fell $0.0735 per share, or 65.3%, from $0.1125 per share on December 17, to close at $0.039 on December 18, 2020.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Decision Diagnostics stock has lost virtually all of its value, causing Plaintiffs and other Class members to suffer significant losses.

---

[3] Superseding Indictment, *USA v. Keith Berman*, 20-cr-278 (D.D.C. May 11, 2021), ECF No. 19, *available at* https://storage.courtlistener.com/recap/gov.uscourts.dcd.225086/gov.uscourts.dcd.225086.19.0.pdf

1

## **JURISDICTION AND VENUE**

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Decision Diagnostics' headquarters are in this Judicial District, the Company conducts business in this Judicial District, and a significant portion of the Company's actions took place within this Judicial District. Defendant Keith Berman also resided in this District, and a significant portion of Berman's actions took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.     Plaintiffs Sanchez and Tossavainen, as set forth in the previously-filed certification, [ECF No. 16-3], acquired Decision Diagnostics common stock at

6

artificially inflated prices during the Class Period and were damaged upon the revelation of the truth that the Company had no viable test for COVID-19.

17.     Defendant Decision Diagnostics is a Nevada corporation with principal executive offices located at 2660 Townsgate Road, Suite 300, Westlake Village, California. During the Class Period, the Company's common shares traded actively in an efficient market on the OTC Pink market ("OTC") under the ticker symbol "DECN," and Company-specific information was rapidly provided to investors who traded on such information via press releases, news coverage and investor discussions on Internet investment-focused message boards, as well as Twitter and other social media.

18.     Defendant Keith M. Berman ("Berman") served as the Company's Chief Executive Officer, Chief Financial Officer, Secretary, and sole Director at all relevant times.

19.     Defendant Berman, as the sole C-level executive and sole Director of Decision Diagnostics, exercised dominant authority over the day-to-day operations of the Company. He possessed the power and authority to control the contents of Decision Diagnostics' press releases, and other market communications. To the extent that he did not personally draft Decision Diagnostics' press releases alleged herein to be misleading, Defendant Berman was provided copies prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to cause them to be corrected. Because of his position with Decision Diagnostics, and his access to material information available to him but not to the public, Defendant Berman knew that the positive representations being made about the testing kit were materially false and/or misleading. Defendant Berman is liable for the false statements and omissions pleaded herein.

20. Decision Diagnostics and Berman are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21. Decision Diagnostics purportedly offers, among other products and services, prescription and non-prescription diagnostics and home testing products. Decision Diagnostics offers to provide blood glucose home testing devices. At the onset of the COVID-19 pandemic, Decision Diagnostics falsely stated that its home testing devices would be approved to test for COVID-19.

22. While serving as the Company's CEO, Berman had misappropriated hundreds of thousands of dollars in Company funds for his own personal use and benefit. For example, as the Superseding Indictment charged, in 2019 and 2020, Berman converted over $360,000 in Company funds for his personal use to pay to chat live on webcams with individuals living in foreign countries. These funds were

spent for entertainment and were not business-related expenses. Berman did not disclose these uses of company funds to investors. *See* Superseding Indictment ¶ 8.

23.     In early 2020, Berman and the Company were experiencing serious financial problems. As alleged in the Superseding Indictment, on March 3, 2020, Berman stated in an email, "my financial situation is perilous." Berman seized upon the COVID-19 pandemic as an opportunity to generate funds. Superseding Indictment ¶ 9. As further alleged in the Superseding Indictment, on March 5, 2020, Berman wrote in an email, "[w]e have a lot at stake here. I am not just trying to raise money to pay [a vendor], but we need a new story and this coronavirus through impedance is the story that will allow me to raise millions." Superseding Indictment ¶ 11.

24.     On or about February 29, 2020, Defendant Berman emailed a South Korean-based vendor and asked whether it was "theoretically possible" to use the impedance technology that Decision Diagnostics used in glucose tests to test for COVID-19 in blood or saliva. The vendor responded that it did not know. *See* Superseding Indictment ¶ 16.

25.     On or about March 2, 2020, Defendant Berman emailed a technical advisor, referred to as "Person 1" in the Superseding Indictment, and falsely stated to Person 1 that the South Korean vendor had informed him it could use an impedance test to detect COVID-19 in blood. Person 1 expressed skepticism and

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

asked Defendant Berman how the vendor planned to develop such a test. Defendant Berman responded that it "[b]eats me how the Koreans plan to do this." Superseding Indictment ¶ 17.

**Defendants Make Materially False and/or Misleading Statements During the Class Period**

26.     As particularized herein, Defendants Berman and Decision Diagnostics issued over one dozen materially false and/or misleading statements throughout the Class Period regarding the Company's purported COVID-19 testing kit, branded "GenViro!." At the time Defendants made these statements, Berman and the Company knew but omitted from investors that they had not manufactured a single testing kit or even a prototype device capable of detecting COVID-19.

27.     Defendants Berman and Decision Diagnostics doubled down on their misrepresentations by claiming progress with the FDA towards obtaining an EUA, even though the Company had not built a COVID-19 testing kit. Specifically, Berman repeatedly claimed that the Company was close to completing the FDA's testing requirements and planned to complete them. At the time of these statements, Berman knew that the Company had not met and lacked the ability to meet the FDA's testing requirements. Similarly, Defendants Berman and Decision Diagnostics falsely touted the purported quick time that GenViro! would take to obtain testing results, and the claimed accuracy of these results, when they had no

10

device that actually delivered results in the time or with the accuracy they boasted to investors.

28.    On March 3, 2020, during pre-market hours, Decision Diagnostics issued a press release touting that "in a break-through discussed for the first time, [the Company] announces . . . the introduction of [its] new screening methodology for the Coronavirus (Covid19)," which "is timely, simple to use, cost effective and will be commercial ready in the summer of 2020." The press release also touted that "government fast track and waivers [sic] begun."

29.    The same press release quoted Defendant Berman, who touted, *inter alia*, that Defendants "have developed a Coronavirus screening method" that "should allow for 80% of the suspected carriers of Coronavirus to exit the quarantine systems in the places where Coronavirus is rampant," and that Defendants "have the technology perfected which will take months off of the development schedule."

30.    The statements identified in Paragraphs 28 and 29 above were materially false and/or misleading when made because: (a) the Company had not in fact developed a viable COVID-19 test, let alone a "break-through" product; (b) the Company had no functional COVID-19 test that was "simple to use, cost effective and … commercial ready in the summer of 2020"; (c) the Company had not "developed a Coronavirus screening method" that allowed "80% of the suspected

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

carriers of Coronavirus to exit the quarantine systems in places where Coronavirus is rampant"; (d) the Company was not then on track to "have the technology perfected" or to "take months off the development schedule"; and (e) the statements omitted that the Company's testing approach was merely a theoretical idea that its technical advisor, Person 1, had indicated internally that it did not make sense to him.

31.     On March 4, 2020, Decision Diagnostics issued another press release stating "[t]his innovative, precise and cost effective product is timely, simple to use, and most importantly will be commercial ready in the late summer of 2020." In the press release, Berman stated "not only will the screening device provide the expected NEGATIVE or POSITIVE result (answer), but with each result provided, the answer will be accompanied by a probability statistic that will allow the user to determine the probability that the POSITIVE or NEGATIVE reported by the system may be a false rendering -- a false POSITIVE or a false NEGATIVE."

32.     The statements identified in Paragraph 31 above were materially false and/or misleading when made because (a) the Company did not have a test that could be "commercially ready" to be used by "late summer of 2020" and (b) the statements omitted that the Company had no functional test or prototype that could either reliably provide a COVID-19 test result or project probabilities of false positives or false negatives.

33.     On March 11, 2020, Decision Diagnostics issued a press release, stating, "[f]irst uses of our kits will be in pharmacies, doctor's offices, clinics and urgent care centers, and long term care facilities. We anticipate the sale of 420,000,000 kits in the first full year of commercial sale" with "Sales Beginning Late 3Q 2020." In the press release, Berman stated "our screening method should allow for 80% of those who suspect that they carry the Coronavirus, to exit the potential quarantine in those places where Coronavirus is rampant, and a higher percentage where it is not." The press release also contained the following image of a purported "Avantage" testing kit and testing kit box containing the words "GenViro!$^{TM}$ COVID-19 Screen" with a tagline "With the GenExpedient Universal Biosensor and 2 sensors to screen for the Coronavirus."

34.    The statements identified in Paragraph 33 above were materially false and/or misleading when made because (a) the Company had no basis to believe it would sell 420,000,000 kits within the first year of production, when it did not yet have a prototype of the kit; (b) the Company had not "developed a Coronavirus screening method" that allowed "80% of the suspected carriers of Coronavirus to exit the quarantine systems in places where Coronavirus is rampant"; (c) the image of a purported device and associated commercial packaging omitted that no such device existed, and the Company had no viable path to market any such device; (d) the statements omitted that the pictured "Avantage" device was for testing glucose

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

not COVID-19; and (e) the statements omitted that the pictured "Biosensor" test strips did not exist and had not yet been designed.

35.    Exacerbating the press release misrepresentations, Berman also posted over 1000 Class Period messages to the Investors Hub ("iHUB") and Investors Hangout message boards using aliases, to promote DECN and inflate the stock price.

36.    For example, Berman created an alias, "Plutoniumimplosion" on the iHUB message board. Berman did not disclose his true identity and falsely denied that he was Berman on at least one occasion. While using this alias, Berman falsely claimed to be an independent shareholder who had owned DECN stock for at least twenty years. Berman, under the alias Plutoniumimplosion, further falsely claimed that he was an industry insider with years of experience working for medical device manufacturers.

37.    Likewise, Berman used the alias "Plutonium" on the Investors Hangout message board for DECN stock. Berman did not disclose his true identity, and falsely represented that his name was "Matthew Steinmann," a fictional identity purporting to be Berman's friend and an independent shareholder of DECN stock.

38.    Berman used the investor message boards to respond publicly to investor doubts regarding the accuracy of the Company's public statements about its COVID-19 blood test. For example, on or about March 12, 2020, an investor

15

questioned whether anybody actually believed that the Company would be ready to bring to market and sell hundreds of millions of units in its first year. Berman responded, using his "Plutoniumimplosion" alias:

> I do. And my company has looked at this situation/opportunity and we believe that the first year worldwide demand for a screening product will be close to 3 billion kits. Eventually large pharma and copy cats will get into the market, or perhaps there are companies a little ahead of DECN. But by and large DECN is, by hook, crook or luck, is in the forefront no matter how loud the naysayers are.

> But then again the 5-6 message board posters may be right and Mr. Berman will find himself in jail or prison.

Plutoniumimplosion, Post to iHUB MESSAGE BOARD, (3/12/2020, 9:41 AM), https://investorshub.advfn.com/boards/read_msg.aspx?message_id=154296523.

39.     The statements identified in Paragraph 38 above were materially false and/or misleading when made because: (a) the Company was not "in the forefront" of COVID-19 testing; and (b) the statements omitted that Decision Diagnostics did not even have a viable COVID-19 test prototype.

40.     Berman and the Company also repeatedly made false and/or misleading statements about the Company's progress towards obtaining EUA. Under the EUA mechanism, the FDA may allow the use of unapproved medical products like testing kits in an emergency to diagnose serious diseases, provided the sponsor of the product meets certain statutory criteria. One of these criteria is a showing that the product may be effective in diagnosing a disease. *See* FDA, *Emergency Use Authorization of Medical Products and Related Authorities*

16

*Guidance for Industry and Other Stakeholders,* January 2017. The FDA's guidance and correspondence with Defendants made clear that approval would require scientific evidence, including clinical testing. Despite being aware of this requirement, Defendants falsely claimed that the Company had a COVID-19 testing kid that could receive FDA EUA to sell GenViro! in the USA and that the Company had a reasonable basis for expecting EUA.

41.    On March 16, 2020, the Company issued a press release, stating:

> Our product, introduced to the world only 14 days ago has entered its crucial development stage. We are awaiting release of blood samples from previously infected people in Daegu, Korea, so that we can complete testing and make a final report to the U.S. FDA so that we may secure our Emergency Waiver. In the meantime, all other requests made by the FDA will be met this week and next.

In the same press release, Defendant Berman stated:

> Once we complete the Emergency Waiver portion of our launch and move into ramping up of commercial production, we plan to offer testing kits and meters to patients for testing at-home. We expect the vast majority of the 420 million test kits we plan to manufacture in the first year of production will be sold to individuals for self-testing.

42.    These statements in Paragraph 41 were materially false and/or misleading when made because (a) they omitted that the Company's South Korean manufacturer had not even finalized or provided a design for a COVID-19 testing kit, let alone told the Company it was in a position to "complete testing" or to make a final report to the FDA; (b) the statements omitted that testing had not begun; and

17

(c) the Company had not begun, let alone completed, preparations that would allow it to manufacture 420 million kits in the first year of production.

43.    On March 17, 2020, the Company issued another press release, stating "[w]e are happy to inform all interested parties that we have raised our 12-month forecast to 525 million kits." In the press release, Defendant Berman stated "[t]o date we have discussed our GenViro™ product with a big box pharmacy chain, a master medical products distribution company, a large commercial lab, and a home health organization." The press release also included the image of the testing kit box the Company featured in its March 11, 2020 release.

44.    The statements identified in Paragraph 43 above were materially false and/or misleading when made because (a) the statements omitted that the Company had not begun, let alone completed, preparations that would allow it to manufacture 525 million kits in the first year of production; (b) the Company had no viable COVID-19 test product or product nearing commercial status that it could sell to major "big box pharmacy" customers; (c) the image of a purported device and associated commercial packaging omitted that no such device existed, and the Company had no viable path to market any such device; (d) the statements omitted that the pictured "Avantage" device was for testing glucose not COVID-19; and (e) the statements omitted that the pictured "Biosensor" test strips did not exist and had not yet been designed.

45.     On March 18, 2020, the Company issued a press release that trumpeted in its title that new FDA guidance would allow for "Near Immediate Distribution of Kits Prior to Emergency Waiver Grant." In the press release, Berman stated:

> GenViro!™ has been validated at the company's R&D center in Daegu, Korea for the H5N1 virus and most recently the methodologically similar corona virus. …

> While the company will still need to provide ample data and a full discussion of its unique technology in the coming days, the new FDA policy will provide a channel that will allow the company to manufacture test kits and put these kits into distribution almost immediately.

46.     The statements identified in Paragraph 45 above were materially false and/or misleading when made because: (a) the vendor in Daegu, South Korea had not validated GenViro! on H5N1 or COVID-19; (b) the statements omitted that the vendor had not developed either a COVID-19 test kit or prototype; (c) the South Korean vendor had not conducted any tests using infected blood samples containing COVID-19; and (d) the Company had no "channel…to manufacture test kits and put these kits into distribution almost immediately."

47.     On March 20, 2020, the Company issued another press release, in which Defendant Berman stated "[o]ur GenViro!TM Rapid Kit will offer Covid-19 test results for $6.95, test a patient in under a minute, require less than 2 microliters of whole blood derived from a finger prick."

48.     The statement identified in Paragraph 47 above was materially false and/or misleading when made because it omitted that the Company had not yet developed a test that could detect COVID-19 with any amount of blood, for any price, or at any length of time.

49.     On March 23, 2020, Decision Diagnostics issued another press release, touting that the "company's methodology employs a simple, easy to use, swift (15 seconds and faster than Rapid) method for determining the presence of a virus in blood lyced into blood plasma." Defendant Berman also made statements regarding the reliability of the test, representing, "[t]he method is safe, effective, and its biggest benefit to the healthcare system is that the device can be used to screen out the 97% or 98% of those tested that are negative for COVID-19. Our method is quicker, provides the desired result, is much cheaper, and effective."

50.     The statements identified in Paragraph 49 above were materially false and/or misleading when made because they omitted that the Company lacked any test (or test prototype) capable of detecting COVID-19, let alone an "effective" test capable of detecting the disease in "15 seconds and faster."

51.     On March 25, 2020, the Company released yet another press release, titled "DECN to Add 2nd Covid-19 Test Kit Using Antibody/Antigen Methodology as a Determination Test for Patients Who Previously Tested Positive for Covid-19 purporting to have developed a second testing kit." The press release stated:

GenViro! Confirm will produce confirmatory results in less than a minute, also based on a small finger prick blood sample. The method is safe, effective, and its biggest benefit to the healthcare system is that the device will confirm or not confirm a positive result, saving the patient the trouble of going to a hospital or reference laboratory for confirmation testing. This is no small thing.

52.     The statements identified in Paragraph 51 above were materially false and/or misleading when made because (a) they omitted that the Company had no viable GenViro! Test; (b) the Company had not in fact developed an "effective" COVID-19 test, let alone a test that provided the claimed "benefit to the healthcare system"; and (c) the Company's statement that it was adding a "2nd COVID-19 test" was misleading because it had not yet developed a first test.

53.     The Company continued to make these representations into April, 2020. On April 3, 2020, Decision Diagnostics announced that it filed an EUA application for a COVID-19 testing kit ("EUA Application"). On April 6, 2020, Decision Diagnostics issued a press release, referencing its EUA application and touting the purported kit. In the press release, Berman said "[o]ur Swift kit will take a small amount of time to administer to a patient by a professional, such as poking a patient's finger-tip to achieve a drop of blood. Results will be available in about 15 seconds."

54.     The statements identified in Paragraph 53 above were materially false and/or misleading when made because: (a) the Company had not actually developed a test kit that could identify COVID-19 using a blood sample; and (b) the statements

21

omitted that the Company had no prototype that could use only a drop of blood to detect COVID-19, or provide results "in about 15 seconds."

55.     On April 7, 2020, Decision Diagnostics issued a second press release touting the EUA application. That press release claimed that in an "exchange[]" with the FDA, "the FDA provided Guidance for our final testing." In the press release, Defendant Berman stated:

> We filed our final application with the FDA for EUA approval on April 3, 2020, taking out all reference to our at-home use Covid-19 kit. We submitted the application late in the afternoon EDT, and incredibly we received our Pre-EUA Acknowledgement the morning of April 4, 2020, less than 24 hours later, and on the weekend. We were so stunned by the rapid acknowledgment that we waited almost two days to inquire whether the acknowledgment was what we have come to know as the "Pre-EUA." We were assured that this letter from the FDA and the device serial number assigned are exactly what we had been hoping for.

> As early as Saturday April 4, it was clear that the FDA review staff was aware that our methodology was different than those slower and older methods that had received FDA EUAs, or were in review. Although the testing requested will be rigorous, it appears that testing will require 30 known Covid-19 positive samples and 30 known Covid-19 negative samples, all samples based on venous blood. The company is now looking to contract with a hospital or commercial laboratory to complete this testing.

56.     The statements identified in Paragraph 55 above were materially false and/or misleading when made because: (a) the statements omitted that the Company did not yet have an actual testing kit that could be validated for an EUA; (b) the statements omitted that no clinical trials had been conducted to validate any

COVID-19 test, and therefore the Company could not have been in a position to "complete" the required testing; and (c) the statements omitted that the Company lacked any plan or resources to "complete" the required testing.

57.     Berman also made false and/or misleading statements in a mid-April 2020 interview with a New York affiliate of CBS that aired on television and was posted on the station's website on May 5, 2020. In the interview, Berman described the Company's COVID-19 testing kit as a "game changer" because "it works and it works fast."

58.     The statement identified in Paragraph 57 above was materially false and/or misleading when made because the test had not been designed, and therefore did not "work[] fast." The Company had not yet manufactured a prototype that could detect COVID-19 in the blood or conducted any testing that could confirm that "it works." The segment also used the misleading images displayed above of the purported box and kit while omitting that the Company had not completed a product that could detect COVID-19 in the blood.

59.     Internally, Defendants acknowledged their failure to satisfy testing standards and contemplated masking this failure by applying political pressure to obtain an exception to the FDA's testing requirements. For example, on April 15, 2020, Defendant Berman emailed the Company's FDA counsel:

> ***We are still, for the most part being held to test standards we will most likely not be able to live up to especially the expected demand for live***

23

*patients to test. That is the killer. So, because we cannot negotiate with them, we do the next best thing, we flood the airwaves with interviews and we use lobbyist type political attacks at the upper levels in the FDA.*

SEC Complaint ¶ 47 (emphasis added).

60.   On April 20, 2020, Berman again emailed the Company's FDA counsel, suggesting he would use his "political plan" to avoid FDA requirements:

> Have we heard back from the FDA concerning the overall testing requirements/needs of our product (after our written summaries)? I want to make sure that we are able to use virus spike venous blood for our testing…If not we will use it anyway because it is impossible for a small company to have HazMat suit people to traipse around the USA seeing live (surviving) donors. If the FDA remains silent or if they tell us no, I will then turn to my political plan.

SEC Complaint ¶ 48.

61.   As alleged in the Superseding Indictment, Berman engaged in his "political plan" in lieu of actually developing a working prototype and providing valid scientific evidence to the FDA that would allow it to issue an EUA. Specifically, Berman had Decision Diagnostics hire consultants to assist him in pressuring the FDA to approve the Company's EUA application. Berman, through his consultants, began pressuring members of Congress to engage the FDA on the Company's behalf, with the goal of influencing the FDA's EUA application process. On April 21, 2020, the consultants circulated false "talking points" that Berman had reviewed and approved to use to pressure politicians. The talking points falsely claimed that the Company's application for EUA was "moth-balled" and

"stuck in limbo" *due to FDA inaction*, rather than the Company's own failure to develop a viable prototype or provide required data to the FDA. *See* Superseding Indictment ¶ 33. While these confidential communications with consultants confirm that Berman and Decision Diagnostics were aware that FDA approval was unlikely and not imminent, despite claiming earlier that it was days away from approval, they did not disclose this adverse information to investors.

62.     Despite not having developed an effective testing kit for COVID-19, Berman and the Company continued to issue statements touting the test and its effectiveness and the likely FDA EUA approval of the kit. On April 23, 2020, Decision Diagnostics issued another press release with an update on the "FDA Emergency Waiver (EUA) Progress." It stated "PharmaTech Solutions GenViro! 'Swift Kit' testing kit will provide the quick answers individuals and employers need. It provides results on the spot with no delay." In the same press release the Company stated it had "two long conversations" with FDA staff and Company management. The Company stated "we believe we have completed discussions and come to an understanding with the FDA on all of the testing required to receive the EUA. We plan to engage a specialty reference laboratory to complete this testing in the next 10 days. Testing should take about a week."

63.     The statements identified in Paragraph 62 above were materially false and/or misleading when made because: (a) the Company had not actually developed

a COVID-19 test kit capable of providing reliable results at all, let alone "the quick answers individuals and employers need" or "results on the spot with no delay"; (b) the Company had not completed discussions with the FDA; (c) the Company had not come to an understanding with the FDA on all of the testing required to obtain EUA; and (d) the Company had no basis or plan to complete necessary testing "in the next 10 days."

64.    Also on April 23, 2020, the SEC issued an order suspending trading in DECN stock from April 24, 2020 to May 7, 2020, because of questions regarding the accuracy and adequacy of information in the marketplace about DECN.

65.    As set forth in the Superseding Indictment, Berman admitted in a private email on June 2, 2020 to the South Korean vendor that "***my company cannot raise money based on GenViro news as long at the SEC is investigating us***." Superseding Indictment ¶ 51 (emphasis added). To attempt to end the SEC's investigation and continue inflating the stock price of DECN, Berman enlisted a longtime DECN shareholder ("Cooperating Shareholder") to write a "shareholder letter" to the SEC. Using his alias "Plutonium," Berman falsely represented to this Cooperating Shareholder that he was "Matthew Steinmann," one of Berman's friends and an independent shareholder of DECN.

66.    The Company continued to issue materially false and/or misleading press releases into May, 2020. On May 12, the Company issued another press

release, stating "[t]he Company's 'PharmaTech Solutions Swift Kit' [COVID-19] testing kit is designed to provide the answers individuals and employers need" and is "engineered to provide accurate results on the spot with no delay."

67.     The statements identified in Paragraph 66 above were materially false and/or misleading when made because, like on March 3 and April 23, the Company omitted that it had not in fact developed a viable COVID-19 test.

68.     On May 21, 2020, Decision Diagnostics issued another press release touting that "the company will update [its] Decision Diagnostics and Pharma Tech Solutions web sites with some of the most recent testing data related to [its] GenViro! Covid-19 :15 Swiftkit Test kits." That press release also quoted Defendant Berman, who touted, *inter alia*, that Defendants "plan to post . . . testing data for [their] GenViro! Covid-19 :15 Swift kit test kits in the next few days," but that "[i]nterested parties will be required to call the company . . . to receive a password(s) to view the files" and "answer a short list of questions" because Defendants' websites "were recently hacked by Cybercriminals in an attempt to discredit the company."

69.     The statements identified in Paragraph 68 above were materially false and/or misleading when made because Defendants had not conducted the necessary testing to demonstrate that their technology could detect COVID-19 in the blood.

27

70.     On or about May 25, 2020, Berman, purporting to be "Matthew Steinmann" sent a private message via the Investors Hangout website to the Cooperating Shareholder, directing the Cooperating Shareholder to "[d]raft a letter to the SEC, the chairman and the lawyer on the suspension notice." *See* Superseding Indictment ¶ 53. As part of his ruse purporting to be Steinmann rather than himself, Berman suggested to the Cooperating Shareholder that he involve "Berman" in the letter process. Thus, the Cooperating Shareholder was misled to believe he was working with both "Matthew Steinmann" and Berman, when they were in fact the same person.

71.     During this time, Berman played a significant role in drafting and editing the purported "shareholder letter," both using his own name and his alias "Matthew Steinmann." For example, "Matthew Steinmann" wrote to the Cooperating Shareholder, "I will talk to [Keith Berman] about that… not whether it is posted, but when[.] the shareholder letter should post just after the company posts its eat shit and die letter directly to Fredo." Berman repeatedly referred to an SEC attorney who was involved in the DECN trading suspension as "Fredo," a character in the Oscar-winning crime movie *The Godfather*. *See* Superseding Indictment ¶¶ 54-56.

72.     Berman encouraged the Cooperating Shareholder to gather signatures from other DECN shareholders before sending the letter to the SEC. As alleged in

the Superseding Indictment, Berman also used his alias "Plutoniumimplosion" on iHUB to recruit shareholders to join the group and sign the "shareholder letter," stating: "there is a group of DECN shareholders assembling to put a shareholder spin on the goings on with the SEC. If you are interested in joining the group, please write to: [The Cooperating Shareholder]." Superseding Indictment ¶ 57.

73.     On June 2, 2020, Defendants caused the Cooperating Shareholder to send the 19-page letter they had helped draft and revise to the SEC, falsely accusing the agency of unethical and inappropriate conduct against the Company and Berman to cover up Defendants' own misconduct. The letter asserted that the SEC's actions "are damaging to humanity with respect to the creation, development, and we hope (as should you and every American), emergency use authorization of the GenViro! products to assist in the detection of the deadly Coronavirus." The shareholder letter accused the SEC of "bias and possibly collusion between the SEC investigators and rogue message board posters many of who are also perhaps cyber criminals, who aim to destroy Decision Diagnostics Corp., and with that the chance to possibly curtail the spread of COVID-19 and return normalcy to all Americans." The letter stated that the SEC was using its investigation as a pretext to "pile on and to demean[] Mr. Berman." The Superseding Indictment alleged that Berman signed the letter using his fake name "Matthew Steinmann." Superseding Indictment ¶ 58.

74.     After the shareholder letter had been sent to the SEC, Berman posted on multiple messages using his "Plutoniumimplosion" alias to the iHUB message board about the letter and other purported letters to the SEC, and further claimed on that message board on June 5, 2020 that SEC attorneys could face liability for investigating the Company: "Fredo now has big problems of his own, and to that end the much talked about DECN shareholder letter does fall into the wheelhouse of the SEC IG and is likely to draw a response especially in the area of staff misconduct. Just my opinion." iHUB MESSAGE BOARD, (June 5, 2020, 12:28 PM), https://investorshub.advfn.com/boards/read_msg.aspx?message_id=156082135.

75.     Berman falsely claimed that "Berman had nothing to do with the letter, but [Matthew Steinmann] did, and so did almost 60 other shareholders, most important word here, shareholders." Plutoniumimplosion, Post to iHUB MESSAGE BOARD (June 8, 2020, 10:33 PM), https://investorshub.advfn.com/boards/read_msg.aspx?message_id=156141689.

76.     The statements identified in Paragraphs 72 to 75 above were materially false and/or misleading when made because: (a) it was the Company's own failure to provide a viable test prototype or actual scientific data demonstrating a basis for EUA, and not "bias" or "collusion" at the FDA, that was responsible for the lack of emergency use approval; (b) it was Defendants, not the SEC's counsel, that had engaged in "misconduct"; and (c) Berman had in fact been extensively involved in

drafting and revising the shareholder letter, and even suggested that the shareholder letter be written in the first place.

77.     Berman also discussed with the Cooperating Shareholder ways to intimidate the SEC and its staff. For example, on or about May 31, 2020, Berman sent a message to the Cooperating Shareholder that "KB [Keith Berman] told me today he is going to hire a private investigator… to investigate Fredo [the SEC attorney]." Superseding Indictment ¶ 61.

78.     On approximately June 13, 2020, Berman posted on investor message board iHUB, using his alias "Plutoniumimplosion," plans to manufacture a second false shareholder letter criticizing the SEC attorneys who had investigated him and the Company:

> [Y]ou would be surprised how much weight that Shareholder Letter has carried. And I believe there will be another one that takes the May 20, 2020 Fredo Perkin [Last name of SEC staff attorney] fantasy/hit job piece and brings Shareholder concerns up to the moment. I will consider it an honor to work on this second shareholder letter. DECN's brief will be posted by the SEC. In my humble opinion you will not have to wait very long, none of us will. I suspect when others read the DECN brief there will be more than a few OMGs. I will wait.

Plutoniumimplosion, Post to IHUB MESSAGE BOARD, (June 13, 2020, 11:54 PM), https://investorshub.advfn.com/boards/read_msg.aspx?message_id=156262407.

79.     Berman used these letters, and his message board posts to try to bring an end to the SEC investigation and maintain inflated prices of DECN shares.

80.     On or about October 27, 2020, Berman falsely claimed to federal law enforcement agents that neither Berman nor the Company had been involved with the shareholder letter, stating "we had nothing to do with the shareholder letter." Superseding Indictment ¶ 64.

81.     Meanwhile, Decision Diagnostics continued to issue false and/or misleading press releases into the Summer of 2020 touting the Company's purported blood testing kit that could supposedly detect COVID-19 almost immediately. On June 4, 2020, Decision Diagnostics issued a press release touting that Defendant Berman had appeared on one of Vancouver's top-rated news and talk radio stations and on a live television talk show to discuss the Company's "GenViro! Covid-19 :15 Swift Kit testing kit." Defendant Berman, quoted in that press release, touted, *inter alia*, that "[w]e will continue working toward an FDA authorized EUA for our GenViro! Swift :15 second testing kits for both professional use and application, and also for at-home use. Media interest such as this demonstrated by a well-respected news/talk station such as CKNW as well as WCBS-TV helps support [Defendants'] contention that [they] have developed a unique testing kit."

82.     The statements identified in Paragraph 81 above were materially false and/or misleading when made because: (a) the Company had not developed "a unique testing kit"; (b) the statements omitted that the Company had been unable to

32

produce a reliable COVID-19 test prototype, let alone one that provided accurate results in 15 seconds; and (c) the Company was not, in fact, "working with the FDA," but instead having failed to provide the required evidence to the FDA, was attempting to undermine the agency through Berman's "political plan."

83.     Additionally, Decision Diagnostics issued two more press releases in June 2020, which, as evidenced by their titles, continued to trumpet information regarding supposed progress towards making available Decision Diagnostics' purported COVID-19 test:

- June 12, 2020 – "DECN Readies Its 2nd EUA Amendment With The FDA For Its GenViro! Swift Professional COVID-19 :15 Test Kit, And Also Announces Its Further Support For More And Continued Worldwide COVID-19 Testing"; and
- June 17, 2020 – "DECN Files Provisional Patent For GenViro! Professional COVID-19 :15 Swift Kit, Adds Enhanced Technology To Allow For Even Swifter Results".

84.     The June 17 press release also purported to have developed a technology that could result in "an expected 30% improvement in result reporting time from the current testing time of :15 seconds."

85.     The statements identified in Paragraphs 83 and 84 above were materially false and/or misleading when made because: (a) the statements omitted that the Company had been unable to produce a reliable COVID-19 test prototype, let alone one that provided accurate results in 15 seconds (or a 30% improvement on that time); and (b) the statements omitted that the Company, unable to provide

the required evidence to the FDA, was trying to evade agency requirements and undermine the EUA process through Berman's "political plan."

86.    In subsequent months, Defendants did not take any steps to develop a COVID-19 test. Despite this, Defendants issued a press release on July 10, 2020, which stated that "[t]est reporting for the GenViro! finger stick kits are currently producing results at :10.5 seconds."

87.    The statement identified in Paragraph 86 above was materially false and/or misleading when made because: (a) GenViro! finger stick kits were not developed at the time of the press release; (b) GenViro! finger stick kits did not effectively test for Covid-19 during any time-period, let alone in 10.5 seconds; and (c) Defendants had not reliably tested whether their concept could detect COVID-19 in the blood at all.

88.    Defendants Berman and Decision Diagnostics misled investors into buying DECN shares on the belief that Defendants had developed a COVID-19 blood prick test, when in fact, they had not. As a result of the fraudulent and/or misleading statements detailed above, DECN shareholders lost millions of dollars by purchasing DECN stock at artificially inflated prices.

## The Truth Emerges

89.    As confirmed in the SEC Complaint, Berman later admitted in a sworn affidavit after the Class Period that no prototype existed before April 7, 2020: "[t]he

34

fact that DECN did not have any test kits (or prototypes) available is hardly remarkable; in fact any assertion to the contrary would correctly be deemed to lack credibility." SEC Complaint ¶ 31.

90.     On December 15, 2020, the DOJ issued the Indictment in federal Court, which was unsealed on December 18, 2020. The Indictment charged Berman with making false statements to the Department of Justice and alleged that Berman compromised the Company's financial standing through his misuse of company funds, misrepresented the viability of the test strip technology in detecting COVID-19 through a series of false and/or misleading press releases aimed at DECN shareholders and potential shareholders issued over the course of 2020. The DOJ alleged that such press releases contained false and/or misleading statements regarding the FDA's approval of the Company's COVID-19 blood "test." Moreover, the Indictment alleged that Berman used an alias on an online investment message board to promote the Company's COVID-19 blood test to shareholders and potential shareholders, and to attempt to threaten and intimidate individuals who approached the SEC and other regulators regarding the Company and Berman's actions. The DOJ Indictment charged Berman with violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and Rule 10b-5 promulgated thereunder, and with making false statements to the SEC in violation

35

of 18 U.S.C § 1001. The indictment sought forfeiture under 18 U.S.C § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 22 U.S.C. § 853(p).

91.    On December 17, 2020, the SEC filed the SEC Complaint in federal court against Defendants, alleging that they had issued a series of press releases that falsely claimed that Decision Diagnostics had developed a finger-prick blood test that could detect COVID-19 in less than one minute. The SEC issued a press release on December 18, 2020, announcing that it had issued the charges. Specifically, the SEC Complaint summarized its allegations against Defendants as follows:

> In the spring of 2020, Berman, the president and CEO of DECN . . . went on a publicity blitz to portray the Company as having created a working, breakthrough technology that could accurately test for [COVID-19] using just a finger-prick of blood and provide results in less than a minute. DECN's share price and trading volume surged as investors piled into the stock. While Berman and DECN portrayed DECN's product as something that would change the landscape of the Covid-19 pandemic paralyzing the world, the truth was the Company did not have a test, only an idea that had not materialized into a product.

> From March 2020 to at least June 2020 . . . Berman made materially false and misleading public statements through DECN press releases and other statements about what he claimed was DECN's blood testing kit that could accurately detect Covid-19 and provide results in less than a minute. Berman also made materially false and misleading statements concerning DECN's efforts to obtain [EUA] from the [FDA], the key regulatory approval DECN needed before it could sell a testing product in the United States.

> In stark contrast to these representations, all DECN actually had at the time of Berman's statements was a theoretical concept that had not yet materialized into a product, and without a product Berman knew that DECN could not meet the FDA's [EUA] testing requirements. These misstatements led to surges in the price and trading volume of DECN.

> DECN and Berman have directly or indirectly violated, and unless restrained and enjoined, will continue to violate, Section 10(b) and Rule 10b-5 of the [Exchange Act] [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5].

SEC Complaint ¶¶ 1-4.

92.     As a result of the disclosure of the fraud in the SEC Complaint and the unsealed DOJ Indictment, Decision Diagnostics' common share price fell $0.0735 per share, or 65.3%, from $0.1125 per share on December 17, to close at $0.039 on December 18, 2020.

93.     On May 11, 2021, the DOJ issued the Superseding Indictment against Keith Berman, which included additional allegations regarding his use of an alias on an additional message board to pump up the value of DECN stock and to obstruct SEC's investigation into Defendants. The indictment included the charges for securities fraud and making false statements, as well as added a count for wire fraud (15 U.S.C. §§ 1343 & 2), and a count for Obstruction of the SEC investigation (18 U.S.C. §§ 1505 & 2).

94.     Because of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Decision Diagnostics stock during the Class Period (the "Class"); and were damaged upon the revelation of the truth on December 17, 2020. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

96.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Decision Diagnostics shares were actively traded on the OTC Pink exchange on heavy volume that often exceeded trading volumes of large, exchange-listed stocks. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Decision Diagnostics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

98.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Decision Diagnostics;

- whether Defendant Berman caused Decision Diagnostics to issue materially false and/or misleading statements about the efficacy of the Company's purported COVID-19 testing kit during the Class Period;

39

- whether Defendants acted knowingly or with deliberate recklessness in issuing materially false statements about the likelihood of securing EUA for their purported COVID-19 testing kit during the Class Period;

- whether the prices of Decision Diagnostics shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

100.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

101.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Decision Diagnostics shares are traded in an efficient market;

40

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period on the OTC. During the Class Period weekly volume averaged approximately 38 million shares, with approximately 325 million shares outstanding;

- Company-specific information regarding COVID-19 test plans was rapidly conveyed to investors via press releases, news coverage, message board postings, and social media, and impounded into the share price of DECN;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's shares; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Decision Diagnostics shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

102.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

103.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute*

41

*Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Both Defendants)

104.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

105.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c) promulgated thereunder by the SEC.

106.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and/or

maintain the market price of Decision Diagnostics shares; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Decision Diagnostics stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

107.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of press releases and/or other statements and documents described above, including statements made to the media that were designed to influence the market for Decision Diagnostics shares. Such statements were materially false and/or misleading in that they failed to disclose the truth that Decision Diagnostics' had not developed a COVID-19 blood testing kit.

108.   By virtue of being the sole senior executive and director at Decision Diagnostics, Defendant Berman dominated the day-to-day operations of the Company and had actual knowledge of the truth when he made or caused to be made the materially false and/or misleading statements alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendant Berman acted with deliberate recklessness in his disregard for the truth with respect to such statements, by ignoring readily available adverse information. Said acts and omissions of Defendant Berman were committed with

43

deliberate reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

109.    Information showing that Defendants acted knowingly or with deliberate recklessness is particularly within Defendants' knowledge and control. As the senior manager and/or director of Decision Diagnostics, Defendant Berman had knowledge of the details of Decision Diagnostics' internal affairs.

110.    Defendant Berman is liable both directly and indirectly for the wrongs complained of herein. Because of his positions of control and authority, Defendant Berman could and did control the content of the statements of Decision Diagnostics. As the sole senior executive officer and director of a publicly-held company, Defendant Berman had a duty to disseminate timely, accurate, and truthful information with respect to Decision Diagnostics' businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and/or misleading press reports and other public statements, the market price of Decision Diagnostics stock was artificially inflated throughout the Class Period. Plaintiffs and the other members of the Class purchased or otherwise acquired Decision Diagnostics stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

111.   During the Class Period, Decision Diagnostics shares were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and/or misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Decision Diagnostics shares at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Decision Diagnostics stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Decision Diagnostics stock declined sharply upon the revelation of the facts alleged herein to the injury of Plaintiffs and Class members.

112.   By reason of the conduct alleged herein, Defendants have knowingly or acted with deliberate recklessness and violated Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder by the SEC.

113.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of the Company's securities

during the Class Period, upon the revelation that the Company had been disseminating misrepresented statements about its purported COVID-19 testing kit to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against Defendant Berman)

114.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.   During the Class Period, Defendant Berman dominated the operation and management of Decision Diagnostics as its sole executive officer and sole director. As a result, he thoroughly dominated and controlled the day-to-day conduct of Decision Diagnostics' business affairs, and was at all times aware (or deliberately disregarded) the adverse non-public information about Decision Diagnostics' misstatement of the viability of the purported COVID-19 testing kit.

116.   As an officer and/or director of a publicly owned company, Defendant Berman had a duty to disseminate accurate and truthful information with respect to Decision Diagnostics' operations and to promptly correct any public statements issued by Decision Diagnostics which had become materially false or misleading.

117.   Because of his positions of control and authority as a senior officer, Defendant Berman was able to, and did, control the contents of the various reports, press releases, and public filings which Decision Diagnostics disseminated in the

marketplace during the Class Period concerning Decision Diagnostics' purported COVID-19 testing kits. Throughout the Class Period, Defendant Berman exercised his power and authority to cause Decision Diagnostics to engage in the wrongful acts complained of herein. Defendant Berman, therefore, was a "controlling person" of Decision Diagnostics within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Decision Diagnostics stock.

118. Defendant Berman, therefore, acted as a controlling person of Decision Diagnostics. By reason of his senior management positions and/or being a director of Decision Diagnostics, Defendant Berman had the power to direct the actions of, and exercised the same to cause, Decision Diagnostics to engage in the unlawful acts and conduct complained of herein. Defendant Berman exercised control over the general operations of Decision Diagnostics and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

119. By reason of the above conduct, Defendant Berman is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Decision Diagnostics.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

47

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives.

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated:  October 14, 2021                 Respectfully submitted,

POMERANTZ LLP

*/s/ Brian P. O'Connell*
Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (SBN 314318)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 881-4859
Facsimile: (312) 229-8811
E-mail: jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024

Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com


BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Co-Lead Plaintiffs*

49

## **PROOF OF SERVICE**

I, the undersigned say:

I am a citizen of the United States and admitted to practice before this Court. I am over the age of 18 and not a party to the within action. My business address is Pomerantz LLP, Ten South La Salle Street, Suite 3505, Chicago, Illinois 60603.

On October 14, 2021, I caused to be served the following document:

### **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

By posting the documents to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed below:

Jennifer Pafiti     jpafiti@pomlaw.com

Joshua B. Silverman     jbsilverman@pomlaw.com

Laurence M. Rosen     lrosen@rosenlegal.com

For those not registered for ECF filing, I served the document by mail to the following parties:

Stephen Mazzara          smazzara@goldbergsegalla.com

Ronald S. Herzog          rherzog@goldbergsegalla.com

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 14, 2021, in Chicago, Illinois.

*/s/ Brian P. O'Connell*
Brian P. O'Connell